THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

**ROBERT STOFER**                                                                                        **PLAINTIFF**

**v.**                                          **Case No. 4:20-cv-00027-KGB**

**JAMES GREENE & ASSOCIATES, INC., and**
**JEFFREY BRANTLY**                                                    **DEFENDANTS**

## OPINION AND ORDER

Before the Court is defendants James Greene & Associates, Inc. ("JGA") and Jeffrey Brantly's (jointly "defendants") motion to dismiss for failure to state claim, or, in the alternative, motion for summary judgment (Dkt. No. 6).[1] The Court has reviewed all parties' filings regarding the pending motion (Dkt. Nos. 6-8, 12, 13, 16, 17, 20, 24, 37).

### I.  Statement of Facts

Unless otherwise stated, the facts are drawn from the defendants' statement of fact, plaintiff Robert Stofer's response to defendants' statement of fact, and defendants' reply to plaintiff's response to defendants' statement of undisputed material facts in support of motion for summary judgment (Dkt. Nos. 7, 13, 17).

Mr. Stofer was hired to work for JGA as its Sales Manager on August 4, 2016 (Dkt. No. 7, ¶ 1). In this capacity, Mr. Stofer reported directly to Kurt Hetherington, JGA's President (*Id.*, ¶ 2). According to JGA, Mr. Stofer in this position was responsible for supervising and managing JGA's Territory Managers—insurance sales agents who work on a full-time basis exclusively within the Company's Sales Division within their assigned territories (*Id.*, ¶¶ 2-3). Mr. Stofer

---

[1] On February 17, 2020, defendants filed a motion to dismiss for failure to state claim, or, in the alternative, motion for summary judgment (Dkt. No. 6). On September 29, 2020, this Court converted defendants' motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) into a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (Dkt. No. 23).

objects to JGA's characterization of his duties as "supervising" or "managing" and instead admits only that he was assigned "to support" Territory Managers (Dkt. No. 13, ¶¶ 2-3).  Immediately upon assuming the responsibilities of the Sales Manager position, Mr. Stofer—because he was subject to a non-compete agreement through his former employment—was initially assigned to support six Territory Managers who worked in areas beyond the geographic scope of his restrictive covenants (Dkt. No. 7, ¶ 3).  When those restrictions expired and beginning on June 1, 2018, Mr. Stofer supported the remaining Territory Managers or up to 15 subordinate employees in total (*Id.*, ¶ 4).  JGA maintains that Mr. Stofer supervised and managed these employees while Mr. Stofer asserts that these employees were Mr. Hetherington's subordinates, not his (Dkt. No. 13, ¶ 4). According to JGA's organizational chart, JGA's Sales Division is a permanent and recognized Department within JGA's organizational structure (Dkt. No. 7, ¶ 5, Ex. 2).  Mr. Stofer asserts that JGA's organizational chart reflects JGA's communication structure, rather than management structure (Dkt. No. 13, ¶ 5).

In exchange for his employment, Mr. Stofer was paid on a salary basis at an initial annual rate of $55,000.00 (*Id.*, ¶ 6).  Mr. Stofer's understanding is that $5,000.00 of the total compensation was paid specifically for signing a non-compete and that the remaining $50,000.00 was paid for employment (Dkt. No. 13, ¶ 6).  Beginning with the July 1, 2018, pay period, Mr. Stofer's salary increased to $60,000.00 per year (Dkt. No. 7, ¶ 7).  In addition, according to JGA, Mr. Stofer as a member of JGA's senior leadership was eligible to receive two additional bonuses: a $5,000.00 bonus every six months if the Sales Division satisfied its sales goals, and a year-end discretionary management bonus for his supervision of JGA's sales team (*Id.*, ¶ 8).  Mr. Stofer denies that the bonuses were discretionary, that they were paid because Mr. Stofer was a member of "senior leadership," or that they were paid because of Mr. Stofer's "supervision" of the sales team (Dkt.

2

No. 13, ¶ 8). Mr. Stofer asserts that the bonuses were paid as a matter of course based on certain pre-established performance markers and are therefore non-discretionary (*Id.*).

JGA asserts that, as Sales Manager, Mr. Stofer's primary function was to supervise the Territory Managers to ensure that the JGA Sales Division met its sales objectives (Dkt. No. 7, ¶ 9). Mr. Stofer denies this statement and asserts that he did not supervise or mange the sales team; Mr. Stofer maintains his "primary function" was to collect, organize, and disseminate information by collecting goals and directives from Mr. Hetherington to communicate to the Territory Managers and collecting sales data and communications from the Territory Managers and relaying that to Mr. Hetherington. (Dkt. No. 13, ¶ 9). JGA defines Mr. Stofer's duties as including motivating, developing, and coaching his team of Territory Managers; managing their day-to-day activities; and helping them address problems and improve the strategies and processes through which they made their sales (Dkt. No. 7, ¶ 10). In this respect, Mr. Stofer monitored the Territory Managers' performance and work activities (*Id.*, ¶ 11). Mr. Stofer opposes use of the word "managing" but acknowledges that his duties included "coaching" (Dkt. No. 13, ¶ 10). As a coach, Mr. Stofer would encourage the Territory Managers to achieve their own personal goals; check in routinely with them; visit them once a month; and work with them and provide feedback (*Id.*).

JGA maintains that Mr. Stofer also supervised and managed the Territory Managers by:

- Calling Territory Managers to review their active pipeline reports every other week,
- Training Territory Managers in the field,
- Auditing Territory Managers' accounts,
- Holding quarterly sales meetings for Territory Managers to provide updated sales information, discuss current issues, and to, among other things, present positive sales strategies,
- Ensuring that Territory Managers complete insurance renewal applications in a timely manner,

- Counseling territory managers by setting the rules of the game and by helping determine those accounts that may not be a fit for JGA,

- Directing the Territory Managers, to whom Mr. Stofer referred as "Team Stofer," to focus on prospecting and quoting activities and to push them to write five quotes per month,

- Observing Territory Managers' performance through the course of "ride-alongs,"

- Requiring Territory Managers to post details regarding their day-to-day activities, which—as Mr. Stofer stated in his own words—was "a new exercise that he monitored,"

- Providing instruction to Territory Managers regarding the submission of expense reimbursement requests, and

- Monitoring his employees' progress to ensure that they stayed caught up and otherwise in the course of day-to-day instruction.

(Dkt. No. 7, ¶ 13). Mr. Stofer denies ever performing any audits, denies determining which accounts were not "a fit for JGA," and argues that he performed many of these actions as clerical tasks, not in a decision-making role (Dkt. No. 13, ¶ 13).

In addition to these duties, JGA states that Mr. Stofer was also responsible for counseling employees and implementing corrective action measures where necessary (Dkt. No. 7, ¶ 14). Mr. Stofer denies that he was permitted to discipline any Territory Managers or have any input regarding discipline of Territory Managers (Dk. No. 13, ¶ 14). With respect to one Territory Manager, Mr. Stofer implemented the following corrective action, an email to a JGA employee, on September 27, 2018:

> From 10/1/18 to 11/15/18 you should complete thirty-five prospect "touches" per week (238 total touches) and enter each "touch" in EPIC in the prospect record as an activity (making Mike Stofer the owner of the activity). As we discussed on Sept. 27, we need to see significant improvement in your activity, proposals, and booked sales during this time period.
>
> /s/ Mike Stofer
> Supervisor

(Dkt. Nos. 7, ¶ 15; 6-14 ).  Mr. Stofer argues that, without any input from him, Mr. Hetherington arranged a meeting involving Mr. Hetherington, Mr. Stofer, and the JGA employee that occurred on September 27, 2018 (Dkt. No. 13, ¶ 15).  Mr. Stofer states that Mr. Hetherington made all of the decisions at that meeting and that Mr. Stofer was given instructions after the meeting to "document the terms of the meeting" and to have the JGA employee sign a counseling report (*Id.*).  Mr. Stofer asserts that this employee was later terminated by Mr. Hetherington without consulting Mr. Stofer (*Id.*).

Mr. Stofer was responsible for assessing the performance of the employees who worked directly under his command, according to JGA (Dkt. No. 7, ¶ 16).  Mr. Stofer admits that he completed assessment forms by recording observations, but he denies that any employees were under his "command" in that he contends that Mr. Hetherington had all control over Territory Managers, their goals, compensation, and terms of employment (Dkt. No. 13, ¶ 16).  Mr. Stofer states that he considered the Territory Managers to be "included on [his] sales team, and as the coach of th[e] team"; Mr. Stofer acknowledged that he was responsible for "build[ing] the strongest and most productive team of territory managers at JG&A." (Dkt. Nos. 7, ¶ 17; Ex. 6-16).  According to JGA, in order to build his team and to serve as an effective and self-proclaimed "coach," Mr. Stofer communicated that he would "establish clear and measurable objectives" and "expect [Territory Managers'] best effort" (Dkt. Nos. 7, ¶ 18; Ex. 6-16).  Mr. Stofer objects to the phrase "build his team" and maintains that he did not do this nor did he set any objectives or goals (Dkt. No. 13, ¶ 18).

On a day-to-day basis, according to JGA, Mr. Stofer's supervision of the Territory Managers ranged from providing advice and guidance regarding insurance renewal quotes to providing direction with respect to prospecting campaigns for new business through his individual,

5

one-on-one observations of Territory Managers' performance in the field (Dkt. No. 7, ¶ 19).  Mr. Stofer denies this and denies that he was permitted to give direction to sales agents without Mr. Hetherington's express permission (Dkt. No. 13, ¶ 19).  JGA asserts that, in addition to his day-to-day supervision, Mr. Stofer established individualized yearly sales goals for each Territory Manager (Dkt. No. 7, ¶ 20).  These individualized yearly sales goals directly affected the Territory Managers' compensation, and Mr. Stofer's recommendations regarding their terms, conditions, and privileges of employment—including with respect to compensation—was afforded particular weight based on JGA's representation to the Court (*Id.*, ¶ 21).  After discussing a Territory Manager's annual goals, the employee and Mr. Stofer would memorialize their understanding on a spreadsheet initialed by each of them (*Id.*, ¶ 22).  Mr. Stofer argues that, although he communicated with Territory Managers and signed goal sheets provided by JGA, "all goals were set by Mr. Hetherington or Mr. Brantley" before that communication (Dkt. No. 13, ¶¶ 20-22).

JGA maintains that, as their Sales Manager, Territory Managers reported their problems, challenges, and grievances directly to Mr. Stofer, who was responsible for helping them to develop effective solutions and strategies to address those issues (Dkt. No. 7, ¶ 24).  Although he admits that sales agents would sometimes conference with him on simple matters, that his responses may have helped the sales agents develop problem solving skills, and that he was intended to be the first line of communication, Mr. Stofer denies that he had authority to solve all issues that sales agents may run into and denies that he had authority to execute decisions that would affect the Territory Managers' schedule, pay, day-to-day activities, expenses, status within the JGA, or anything else (Dkt. No. 13, ¶ 24).  JGA states that Mr. Stofer was also responsible for overseeing Territory Managers' compliance with JGA's policies and procedures, and in some cases, policies and procedures that Mr. Stofer personally developed, implemented, and enforced (Dkt. No. 7, ¶

25). Mr. Stofer denies that he "developed any policies or procedures, that he successfully implemented any policies or procedures, or that he had any authority to enforce any policies of procedures" (Dkt. No. 13, ¶ 25). Likewise, if Territory Managers were unable to work due to illness or personal concerns, or if they were going to be away from work on vacation, they were required to notify Mr. Stofer (Dkt. No. 7, ¶ 26). Mr. Stofer denies that Territory Managers were ever required to report their absences (Dkt. No. 13, ¶ 26).

When Territory Managers' performance did not meet his expectations, Mr. Stofer was responsible for addressing those issues according to JGA (Dkt. No. 7, ¶ 27). Mr. Stofer would address these issues, including poor group performance, during quarterly sales teleconferences (*Id.*, ¶ 30). JGA contends that upper management became involved only on the rare occasion that Mr. Stofer failed to address a problem adequately or otherwise if Mr. Stofer requested advice and guidance from Mr. Hetherington (*Id.*, ¶ 31). Mr. Stofer argues that he had no authority to discipline Territory Managers and that Territory Managers were not required to follow any suggestions that he made regarding how to improve performance; he claims that the communications were merely reminders of the goals and the potential rewards and consequences for meeting or not meeting those goals, given that he claims he had no authority to discipline, offer incentives, or implement consequences (Dkt. No. 13, ¶¶ 27, 30-31).

Mr. Stofer also conducted research and long-term strategic planning to further grow the Sales Division, according to JGA (Dkt. No. 7, ¶ 32). On his own initiative, Mr. Stofer developed a survey for his Territory Managers' completion so that he could research, analyze, and identify opportunities to improve JGA's sales (*Id.*, ¶ 33). After completing that survey and synthesizing its results, Mr. Stofer then created a presentation to summarize his research (*Id.*, ¶ 34). The PowerPoint includes responses from 13 Territory Managers, all of whom Mr. Stofer directly and

exclusively supervised (*Id.*, ¶ 35). The PowerPoint document identification page demonstrates that the "author" of the presentation is "RMS," which are Mr. Stofer's initials (*Id.*, ¶ 36). In response, Mr. Stofer argues that these assertions do not establish independence, discretion, or control by Mr. Stofer (Dkt. No. 13, ¶ 32).

As Sales Manager, Mr. Stofer was instrumental in developing JGA's new online sales processing system known as "Epic Opportunities" and was "the driving force" behind JGA's implementation of the system (Dkt. No. 7, ¶¶ 37, 39). Specifically, after attending a related training conference, Mr. Stofer used his own discretion and expertise to create and implement JGA-specific policies and procedures as a guide for the Territory Managers' use (*Id.*, ¶ 38). Mr. Stofer argues that he "merely summarized the training and [] was not permitted to create or implement any policies" (Dkt.No. 13, ¶¶ 37-39).

Mr. Stofer acknowledges that he was paid on a salary basis and that his "duties included coaching and training territory managers" (Dkt. Nos. 7, ¶ 42; 13, ¶ 42).

Only JGA's CEO, Jeffrey Brantly, has the final authority to hire and fire employees (*Id.*, ¶ 43). No JGA manager can hire or fire without the CEO's involvement, according to JGA (Dkt. No. 7, ¶ 44). JGA represents that Mr. Stofer's recommendations regarding personnel matters were afforded considerable weight and that Mr. Stofer was expected to make suggestions regarding hiring and firing, as well as to make recommendations regarding sales goals and related compensation-based decisions (*Id.*, ¶ 45). Mr. Stofer participated in interviews for Territory Managers and provided his recommendations with respect to hiring decisions (*Id.*, ¶ 46). JGA represents that these recommendations were relied upon extensively by JGA, and JGA's President could not recall any instance in which Mr. Stofer recommended that JGA hire an individual who was not ultimately extended an offer of employment (*Id.*, ¶ 47). Mr. Stofer denies these assertions

and states that he was only "invited to talk" with a prospective Territory Manager once and that he was never asked to give any opinions on hiring decisions (Dkt. No. 13, ¶¶ 45-47).

Mr. Stofer's business card, which he approved and distributed, identified him as "Sales Manager" (Dkt. Nos. 7, ¶ 49; 13, ¶ 49).  Each of Mr. Stofer's pay stubs, generated by JGA's payroll system, described Mr. Stofer's compensation as "Management Salary," and he received multiple bonuses designated exclusively for JGA's management staff (*Id.*, ¶ 50).  JGA paid extensively for Mr. Stofer's travel-related expenses—typically incurred on a corporate credit card entrusted to Mr. Stofer—to coach employees, to conduct sales and new hire training with his employees, and otherwise to supervise Territory Managers' work and performance through ride-alongs and one-on-one in-person visits; Mr. Stofer does not deny these factual allegations but disputes their connotation (*Id.*, ¶ 51).  Only JGA managers are entrusted with corporate credit cards; Mr. Stofer does not deny this factual allegation but disputes its connotation (*Id.*, ¶ 52).

After his employment was terminated on October 24, 2019, Mr. Stofer represented to the Arkansas Department of Workforce Services on November 4, 2019, that his previous job duties at JGA had been "[c]onsulting and coaching territory managers in six states, reporting to President" (*Id.*, ¶ 53).

**II.     Analysis**

    **A.     Legal Standard For Summary Judgment**

Pursuant to the Federal Rules of Civil Procedure, the Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is genuine if a reasonable jury could render its verdict for the non-moving party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a factual dispute is insufficient alone to bar summary

judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989). Mere denials or allegations are insufficient to defeat an otherwise properly supported motion for summary judgment. *See Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271-72 (8th Cir. 1992); *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).

First, the burden is on the party seeking summary judgment to demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). If the moving party satisfies its burden, the burden then shifts to the non-moving party to establish the presence of a genuine issue that must be determined at trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). The non-movant "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Matsushita*, 475 U.S. at 586, 587). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "[I]n an FLSA exemption case such as this, the employer . . . has the burden of proving the employee fits within one of the FLSA exemptions. *Grage v. N. States Power Co.-Minnesota*, 813 F.3d 1051, 1054 (8th Cir. 2015) (*citing Fife v. Harmon*, 171 F.3d 1173, 1174 (8th Cir.1999)). "[W]hether [employees'] particular activities excluded them from the overtime benefits of the FLSA is a question of law." *Grage*, 813 F.3d at 1054 (citing *Spinden v. GS Roofing Prods. Co.*, 94 F.3d 421, 426 (8th Cir.1996)).

### B.     Legal Standard For FLSA Claims

In his complaint, Mr. Stofer argues that JGA incorrectly classified him as exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") and the Arkansas Minimum Wage Act ("AMWA") and did not pay him an overtime premium for the hours he worked in excess of 40 hours in a week (Dkt. No. 1, ¶ 28).

"The FLSA requires employers to pay overtime of at least one and one-half times the regular pay rate for employees who work over forty hours in one workweek." *Grage*, 813 F.3d at 1054 (citing 29 U.S.C. § 207(a)(2)).  Some employees are exempt from the FLSA's overtime requirements. *Id.* § 213(a)(1).  Such exempt employees include "any employee employed in a bona fide executive, administrative, or professional capacity. . . ." 29 U.S.C. § 213(a)(1). "The FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." *Cummings v. Bost, Inc.*, 218 F. Supp. 3d 978, 985 (W.D. Ark. 2016) (quoting *Carter v. Primary Home Care of Hot Springs, Inc.*, Case No. 6:14-cv-6092, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015)).

"[W]hether an employee is exempt under the FLSA is an issue of law." *Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1081 (8th Cir. 2000) (citing *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)).  The Eighth Circuit has held that "[c]ourts should broadly interpret and apply the FLSA to effectuate its goals because it is remedial and humanitarian in purpose." *Specht v. City of Sioux Falls*, 639 F.3d 814, 819 (8th Cir.2011) (internal quotation omitted).  To promote this goal, the Department of Labor ("DOL") has provided regulations that include factors to guide the Court in determining whether an employee qualifies for an exemption.  *See Fife v. Bosley*, 100 F.3d 87, 89 (8th Cir.1996) (citing 29 C.F.R. pt. 541).

With regard to the "executive exemption," these regulations state:

(a)   The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:

  (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities;
  (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
  (3) Who customarily and regularly directs the work of two or more other employees; and
  (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100. [2]

The U.S. Department of Labor's regulations define the term "management" to include:

activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102. "The phrase 'two or more other employees' means two full-time employees or their equivalent." 29 C.F.R. § 541.104(a). "The phrase 'customarily and regularly' means a frequency that must be greater than occasional but which, of course, may be less than constant.

---

[2] The minimum salary basis required to qualify for the executive and administrative exemptions rose from $455.00 to $684.00 per week on January 1, 2020. 29 C.F.R. §§ 541.100, 541.200. The change does not affect this lawsuit, as Mr. Stofer's salary exceeded both the pre-2020 and post-2020 limits throughout his employment at JGA.

Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. § 541.701.

Factors to consider when determining whether an employee's suggestions and recommendations are given "particular weight," "include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon." 29 C.F.R. § 541.105.

With regard to the "administrative exemption," these regulations state:

(a) The term "employee employed in a bona fide administrative capacity" in section 13(a)(1) of the Act shall mean any employee:

(1) Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities;
(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.

"The term 'primary duty' means the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700. With regard to discretion and independence under the administrative exemption:

The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the

> decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review.

29 C.F.R. § 541.202

"The employer has the burden to prove that its employee is an executive and therefore exempt from the FLSA's overtime pay requirements." *Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 903 (8th Cir. 2014) (citing *Fife v. Harmon*, 171 F.3d 1173, 1174 (8th Cir.1999)). However, the Supreme Court has rejected the principle that the FLSA's exemptions should be construed narrowly and instead determined that they are to be given a "fair reading." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

Mr. Stofer brings claims under both the FLSA and the AMWA (Dkt. No. 1, at 1). Defendants move for summary judgment on all claims, FLSA and AMWA (Dkt. No. 6, ¶ 1). In their briefing, the parties do not argue to the Court any differences in interpreting these laws or their exemptions. Generally, "[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner." *Cummings v. Bost, Inc.*, 218 F. Supp. 3d 978, 985 (W.D. Ark. 2016) (quoting *Carter v. Primary Home Care of Hot Springs, Inc.*, Case No. 6:14-cv-6092, 2015 WL 11120563, at *2 (W.D. Ark. May 14, 2015)).[3]

---

[3] The Court notes that the AMWA states that its overtime requirements "shall not apply to any employee exempt from the overtime requirements of the federal [FLSA] pursuant to the provisions of 29 U.S.C. § 213(b)(1)-(24) and (b)(28)-(30), as they existed on March 1, 2006." Ark. Code Ann. § 11-4-211(d). Furthermore, the Arkansas Department of Labor "may rely on the interpretations of the U.S. Department of Labor and federal precedent established under the [FLSA] in interpreting and applying the provisions of the Act and Rule 010.14-100 through -113, except to the extent a different interpretation is clearly required." Ark. Admin. Code § 010-14.1-112.

### C.  Analysis Of FLSA "Executive" Exemption

It is undisputed that Mr. Stofer was paid on a salary basis and received above the minimum salary of $455.00[4] per week, thereby meeting the first requirement of the executive exemption. 29 C.F.R. § 541.100. Further, at all times during his employment at JGA, Mr. Stofer directed two or more employees (Dkt. Nos. 7, ¶¶ 3-4; 6-8). Therefore, the Court considers if there is a genuine dispute that remains for trial regarding whether Mr. Stofer's "primary duty" was management as would qualify him under the executive exemption and whether his suggestions or recommendations regarding personnel decisions were given "particular weight."

Mr. Stofer argues that he did not exercise independent judgment in carrying out his duties and that his role primarily involved acting as the communication link between Mr. Hetherington and the Territory Managers, tracking sales agent activity, collecting and reporting data at the direction of Mr. Hetherington, and coaching Territory Managers in order to assist and encourage them to be more productive (Dkt. Nos. 1, ¶ 26; 12, at 4). Mr. Stofer characterized his role as "collect[ing], organiz[ing], and disseminat[ing] information." (Dkt. No. 13, ¶ 9).

However, JGA points to Mr. Stofer's role in supervising the Territory Managers. Based upon undisputed record evidence, Mr. Stofer was over "JGA's Sales Division, which is a recognized department and subdivision of JGA's enterprise." (Dkt. No. 6-1, ¶¶ 12-14). Mr. Stofer would encourage the Territory Managers to achieve their individual sales goals, check in routinely with them, visit them monthly, and provide feedback (Dkt. No. 13, ¶ 10). When Territory Managers entered their information in JGA's reporting system, Mr. Stofer would review that

---

[4] During Mr. Stofer's employment at JGA, the minimum salary for the executive and administrative exemptions was $455.00 per week. *See* 29 C.F.R. § 541.100. As of January 1, 2020, the limit rose to $684.00 per week. This change does not affect this suit, as Mr. Stofer's salary was always greater than either requirement.

information and follow up if the information was not timely entered (Dkt. No. 6-5, ¶ 11).  Eric Townsend, a Territory Manager at JGA, stated that he would go to Mr. Stofer for advice and guidance in regard to sales and that, when Mr. Townsend wanted to change his territory, he went to Mr. Stofer with that request (Dkt. No. 6-5, ¶¶ 12-3).  Further, Mr. Stofer engaged in "drive alongs" with JGA's Territory Managers to observe them in the field and to provide feedback and guidance.  *See* Declaration of Eric Townsend (Dkt. No. 6-5); Declaration of Travis Weaver (Dkt. No. 6-6).  Mr. Stofer also "admits that he authored the training aid for the Epic software that JGA wished to implement for the sales agents." (Dkt. No. 13, ¶ 25).

While Mr. Stofer denies that his primary duty involved the management of the Territory Managers, "mere denials" are insufficient.  *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d at 271-72.  Mr. Stofer does not deny performing many of the actions attributed to him by JGA, but he argues that he performed those actions in a "clerical role."  However, the undisputed record evidence before the Court, even construing all reasonable inferences in favor of Mr. Stofer, demonstrates that Mr. Stofer's primary duty was in fact management.  Mr. Stofer was involved in establishing Territory Manager's annual goals, which impacted their compensation.  He was involved in maintaining and monitoring sales records for use in supervision of employees through the Epic system.  He answered Territory Manager's questions and provide feedback and guidance on their insurance sales.  He monitored Territory Manager's sales and intervened when employees were falling short.  He prepared training materials and ensured compliance.  Each of these actions bring him squarely under the DOL's definition of "management" and demonstrate that his role was more than one of "collecting and disseminating information."  The fact the Mr. Stofer was not the ultimate authority at JGA does not negate that his primary duty was management of those Territory Managers under his supervision.  Therefore, the Court finds that, on the undisputed

record evidence before the Court even construing all reasonable inferences in favor of Mr. Stofer, JGA has met its burden of demonstrating the "primary duty" prong of the executive exemption.

Regarding the final element necessary for the executive exemption to apply, that the employee be given "particular weight" in hiring/firing decisions, "more than informal input, solicited from all employees, is needed to prove applicability of the executive exemption." *Madden v. Lumber One Home Ctr., Inc.*, 745 F.3d 899, 904 (8th Cir. 2014). In *Madden*, the court held that in order to determine if an employee satisfies the hiring/firing component of the executive exemption, the court must look to an employee's "actual job functions, not intended responsibilities." 745 F.3d at 906 (citing 5 C.F.R. § 551 .202(e) (noting that FLSA exemptions are based on "duties actually performed by the employee")). However, the employee need not be the final decisionmaker. *See* 29 C.F.R. § 541.105 ("An employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.").

It is undisputed that Mr. Stofer lacked the authority to hire and fire other JGA employees (Dkt. No. 8, at 14). Only JGA's Chief Executive Officer, Jeffrey Brantly, had the final authority to hire and fire employees (Dkt. No. 6-1, ¶ 56). JGA asserts that Mr. Stofer's "recommendations regarding personnel matters were afforded considerable weight" and that Mr. Stofer "was expected to make suggestions regarding hiring and firing, as well as his recommendations regarding sales goals and related compensation based decisions." (Dkt. Nos. 6, ¶¶ 56-57; 7, ¶ 45). "JGA's President could not recall any instance in which [Mr. Stofer] recommended that JGA hire an individual who was not ultimately extended an offer of employment." (Dkt. No. 13, ¶ 47). While Mr. Stofer argues that he was only "invited to 'talk with' a prospective Territory Manager once,"

JGA states that "there was not a substantial amount of turnover within his Department" during his time at JGA (Dkt. No. 13, ¶¶ 45-6). Mr. Stofer also argues that he was never asked to "make any opinions on hiring decisions" and that his "suggestions regarding hiring, termination, or compensation-based decisions were turn down 100% of the time." (Dkt. No. 13, ¶ 45). Further, he states that none of the individuals he recommended to Mr. Hetherington were either interviewed or seriously considered (Dkt. No. 13, ¶ 47).

Despite Mr. Stofer's arguments to the contrary, he has not presented record evidence to contradict the claim that JGA did place "particular weight" on his suggestions. Final hiring and firing authority rested with JGA's President, according to record evidence, and a refusal to interview or hire an individual does not necessarily imply that Mr. Stofer's suggestions were not duly considered. Rather, Mr. Stofer's involvement in JGA's personnel decisions, including his presence in at least one hiring discussion, suggests that JGA has met its burden on the undisputed record evidence before the Court of satisfying the fourth element of the executive exemption to the FLSA.

Therefore, the Court concludes that Mr. Stofer was properly classified as exempt from the FLSA and AMWA's overtime requirements as an executive employee.

### D. Analysis Of FLSA "Administrative" Exemption

The same salary requirements apply to the administrative exemption as to the executive exemption. 29 C.F.R. § 541.200(a)(1). Therefore, Mr. Stofer also meets the first prong of the administrative exemption to the FLSA.

Much of the same work that brings Mr. Stofer under the executive exemption to the FLSA also relates to the JGA's "management or general business operations." 29 C.F.R. § 541.200(a)(2); *Auer v. Robbins*, 65 F.3d 702, 720 (8th Cir. 1995), aff'd, 519 U.S. 452 (1997) ("The principles

utilized in determining whether an employee's primary duty is management also apply to determine whether an employee's primary duty is administration, albeit focused on administrative rather than managerial duties."). Mr. Stofer was not responsible for making insurance sales. Rather, he provided administrative support for the Territory Managers that made those sales by monitoring their sales records and working with the Territory Managers to develop sales strategies. In other words, Mr. Stofer "engage[d] in work that [was] 'ancillary to [his] employer's principal production activity,'" which functions the courts have determined to be administrative work. *Grage*, 813 F.3d at 1056.

Similar to those officers in *Auer* who provided "a 'first line response'" for those subordinate officers whose job performance may be struggling, there is undisputed record evidence that Mr. Stofer served as the first line of communication and advice for the Territory Managers in the field. *Auer*, 65 F.3d at 720. Mr. Stofer's role was also similar to those quality control officers whose job it was to ensure that "personnel are functioning in a manner consistent with department policies." *Id.*, at 721. Based on the undisputed record evidence before the Court, construing all reasonable inferences in favor of Mr. Stofer, Mr. Stofer's primary duty was administration, as understood in the FLSA exemption.

As to whether Mr. Stofer's "primary duty" included the "exercise of discretion and independent judgment with respect to matters of significance," Mr. Stofer argues that his actions "were explicitly dictated by Mr. Hetherington." (Dkt. No. 12, at 36-7). However, the DOL has explicitly stated that "the term 'discretion and independent judgment' does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review." 29 C.F.R. § 541.202. Through developing training and protocols, and through his one-on-one management of the Territory Managers, specifically during their ride-alongs, Mr

Stofer was able to exercise discretion and judgment in the ways that sales were made at JGA. The fact the Mr. Hetherington or Mr. Brantley were involved in reviewing his decisions or had the final say over outcomes, does not strip Mr. Stofer of his independent judgment.

The Court is not persuaded by Mr. Stofer's reference to *Beauford v. ActionLink, LLC*, 781 F.3d 396 (8th Cir. 2015). Unlike the "Brand Managers" in *Beauford*, Mr. Stofer was not "simply follow[ing] set scripts and well-established techniques, procedures or specific standards described in manuals or other sources." 781 F.3d at 404 (quotations omitted). The undisputed record evidence before the Court indicates that Mr. Stofer exercised his discretion and independent judgment by developing training materials and protocols and by surveying the Territory Managers under his supervision in order to determine ways to increase sales.

Accordingly, and in the alternative, the Court concludes that Mr. Stofer falls under the administrative exemption to the FLSA and AMWA's overtime requirements.

### III. Conclusion

For these reasons, the Court grants summary judgment in favor of JGA and determines on the undisputed record evidence before the Court the Mr. Stofer was correctly classified as exempt during his employment at JGA, under either the executive or administrative exemptions to the FLSA and the AMWA. 29 U.S.C. § 201, *et seq.* ("FLSA"); Ark. Code Ann. § 11-4-201, *et seq*. The Court accordingly dismisses with prejudice Mr. Stofer's complaint. His requests for relief as to JGA and Mr. Brantly are denied.

It is so ordered this 25th day of March, 2021.

_Kristine G. Baker_
Kristine G. Baker
United States District Judge